**FILED**

**July 25, 2016**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time 1:49 PM**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT COOKEVILLE

| | | |
|---|---|---|
| **Jason Thompsen,** | ) | **Docket No.: 2014-04-0012** |
| **Employee,** | ) | |
| **v.** | ) | **State File No.: 77580-2014** |
| | ) | |
| **Concrete Solutions,** | ) | |
| **Employer,** | ) | |
| **And** | ) | **Judge Robert Durham** |
| | ) | |
| **Argos Insurance Company,** | ) | |
| **Insurance Carrier.** | ) | |

---

### COMPENSATION HEARING ORDER GRANTING BENEFITS

---

This case came before the undersigned Workers' Compensation Judge on July 6, 2016, for a compensation hearing. The Employee, Jason Thompsen filed a Petition for Benefit Determination to determine if the Employer, Concrete Solutions, is obligated to provide workers' compensation benefits for a work-related injury to his left ankle sustained on July 10, 2014. The primary issue is whether Mr. Thompsen was an independent contractor or an employee of Concrete Solutions at the time of the injury. Secondary issues include reimbursement for Mr. Thompsen's out-of-pocket medical expenses and the extent of his temporary disability.

The Court holds the evidence submitted by Mr. Thompsen is sufficient to establish he was an employee of Concrete Solutions at the time of his injury, thus entitling him to workers' compensation benefits. The Court further holds Mr. Thompsen proved his out-of-pocket medical expenses were incurred for reasonable and necessary medical treatment of his work injury and the injury rendered him temporarily disabled for 17.3 weeks.

1

## Stipulations

- Mr. Thompsen sustained an injury to his left ankle on July 10, 2014, that arose out of and in the course of employment.
- Mr. Thompsen sustained a two-percent impairment rating to the body due to his work injury on July 10.
- Concrete Solutions paid $3,850.00 in medical expenses with Dr. Gregory Roberts as the treating physician for Mr. Thompsen's injury.
- Medical expenses not paid by Concrete Solutions total $684.00.
- Mr. Thompsen's average weekly wage with Concrete Solutions was $482.50, resulting in a compensation rate of $321.66.
- Mr. Thompsen did not return to work at a wage equal to or greater than his average weekly wage at Concrete Solutions during the nine-week compensation period following maximum medical improvement.
- Mr. Thompsen was over the age of forty at the time of the injury.
- Mr. Thompsen has a high school education and worked in Putnam County, Tennessee at the time of the injury.

## History of Claim

After working for a large construction company for several years, Eric Turney formed his own concrete forming company, Concrete Solutions, a few years ago. Upon starting his business, Mr. Turney obtained workers' compensation insurance, primarily because others advised him to do so and general contractors usually required it. However, he intended the insurance to cover those working for Concrete Solutions should they suffer a work-related injury.

Upon starting his company, Mr. Turney paid those working for Concrete Solutions on a weekly basis at an hourly wage. However, he did not withhold deductions from their checks; instead, he required them to complete a "1099" federal tax form, which designated those workers as "independent contractors" for tax purposes. At the compensation hearing, Mr. Turney admitted he did so primarily because of his difficulty and inexperience with the bookkeeping necessary to make payroll withholdings.

In early 2014, Concrete Solutions obtained a job that involved building a house out of concrete, which required pouring concrete vertically in order to form the walls of the home. Mr. Turney had limited experience with vertical concrete, and the supervisor he hired to perform the work proved unsatisfactory. Mr. Turney used to work with Mr. Thompsen and was aware of his expertise in vertical concrete. Although they had casually spoken several times at chance meetings about Mr. Thompsen coming to work for Concrete Solutions, Mr. Turney now approached Mr. Thompsen in earnest and asked him to consider working for Concrete Solutions as a supervisor over construction of the

concrete home. Mr. Thompsen agreed to quit his full-time job with another construction company and begin working for Concrete Solutions.

Mr. Turney and Mr. Thompsen met at Mr. Turney's home, where they agreed Mr. Thompsen would work for Concrete Solutions at a wage of $16.00 per hour for approximately forty hours per week. At that time, Mr. Turney informed Mr. Thompson that he would not make any withholdings from his paycheck, but would instead require him to sign a 1099. Mr. Thompsen testified he had never worked anywhere where he had been compelled to sign a 1099 and voiced concern about it. He further testified Mr. Turney assured him the arrangement was only until he had sufficient time to solidify the business. Mr. Turney testified he could not remember the details of their conversation, but, given Mr. Thompsen's history of working for large construction companies, he did not dispute it. In any event, Mr. Thompsen signed the 1099 and began supervising the concrete house project the following Monday.

Mr. Turney met Mr. Thompsen at that job site and introduced him to the workers as their new supervisor. At that time, he informed the former supervisor of the new hierarchy. Mr. Turney gave Mr. Thompsen the authority to terminate the demoted supervisor should it prove necessary. Following that visit, Mr. Turney made only occasional visits to the job site and allowed Mr. Thompsen to supervise the day-to-day activities in constructing the home, although they did frequently discuss the steps and procedures necessary to build it. Mr. Turney acknowledged he retained ultimate authority on how to proceed with building the home.

Mr. Thompsen hired two additional workers, and Concrete Solutions paid them at an hourly rate through a weekly paycheck, although they were also required to sign a 1099. Approximately two weeks after Mr. Thompsen started work, he terminated the former supervisor. At that point, Mr. Turney offered to pay Mr. Thompsen an additional dollar per hour.

At the job site, Concrete Solutions provided all of the heavy equipment necessary to perform the job, including a forklift that Concrete Solutions rented. It also provided concrete saws, hammer drills, skill-saws, concrete rakes and other tools, as well as a storage box to contain all the tools when the workers were off-site. The only tools provided by Mr. Thompsen were those on his personal toolbelt, as is customary in construction, as well as a couple of stepladders. In addition to tools, Concrete Solutions also provided all of the supplies necessary to complete the job.

Mr. Turney and Mr. Thompsen agreed that the goal was to work at least forty hours each week on completing the concrete house, although weather often kept them from doing so. Mr. Turney testified Mr. Thompsen was free to offer his services elsewhere while working on the house; however, Mr. Thompsen testified that was never his understanding and the hours required to work on the project prohibited him from

3

working elsewhere.

The parties offered conflicting versions of the proposed duration of the working relationship. Mr. Thompsen testified that when he quit his job and began working for Concrete Solutions, it was with the intention and understanding that Concrete Solutions would continue to employ him after they completed the concrete home. Mr. Turney testified he retained Mr. Thompsen only for the concrete home project because of his expertise with vertical concrete, and that while he hoped additional work would be available, he did not guarantee Mr. Thompsen further employment once they finished the concrete home.

On July 10, 2014, Mr. Thompsen was working on the concrete home when he fell between joists for the second floor, falling twelve feet to the concrete below. The fall caused Mr. Thompsen to break his left ankle as well as disrupt the tissue connecting his tibia and fibula. (Ex. 1 at 7, 8.) On July 14, Dr. Gregory Roberts, an orthopedist, performed surgery on Mr. Thompsen's ankle, repairing it with a plate and screws. *Id.* Mr. Turney paid $3,850.00 in medical expenses associated with Mr. Thompsen's surgery. Following the surgery, Dr. Roberts kept Mr. Thompsen at non-weight bearing status until August 27, when he indicated he could bear weight as tolerated. (Ex. 1 at 10.) On September 24, Dr. Roberts opined Mr. Thompsen could begin working on motion in his ankle.

In September 2014, Mr. Thompsen returned to work for Concrete Solutions for a few weeks. By that time, Mr. Turney's wife was also working for Concrete Solutions, and she and Mr. Turney decided to give everyone working there the option of having withholdings taken from their checks. Mr. Turney explained the only difference between those who chose to be "employees" and those who chose to continue receiving 1099s was that the "employees" would be given priority over any work that might be available. Therefore, when Mr. Thompsen returned, Concrete Solutions withheld taxes from his paycheck.

Mr. Thompsen supervised a job at Tennessee Tech; however, his ankle injury still severely limited his physical activities. Mr. Thompsen asked Mr. Turney to pay his outstanding medical bills for anesthesia and imaging studies, but he declined to do so. Mr. Thompsen only worked for two weeks before Concrete Solutions laid him off. He did not return to work for Concrete Solutions.

Mr. Thompsen continued treating with Dr. Roberts. On October 21, 2014, Dr. Roberts indicated Mr. Thompsen's ankle showed no instability and decent range of motion. (Ex. 1 at 59.) X-rays revealed no evidence of a fracture. *Id.* Mr. Thompsen complained of foot pain, which Dr. Roberts opined was due to altered gait due to some loss of motion. *Id.* He recommended additional therapy to increase range of motion. *Id.* On November 19, Dr. Roberts noted Mr. Thompsen could return to light duty, seemingly

4

as of October 21, the date of his last visit. (Ex. 1 at 14.) On December 3, Dr. Roberts noted Mr. Thompsen's ankle appeared healed, although he still wanted him to undergo therapy and there was a possible need for hardware removal. (Ex. 1 at 15.) Dr. Roberts saw Mr. Thompsen on a few more occasions and on July 29, 2015, assessed him with a two-percent impairment to the body as a whole based on the AMA Guidelines, 6th ed. (Ex. 1 at 19.)

With regard to Mr. Thompsen's ability to return to work following his injury, Dr. Roberts testified at his deposition that, "it's hard to go retrospectively go back and figure out how much time would have been reasonable to be off work with good certainty." (Ex. 1 at 17.) However, "[t]hree to four months is typically what people are off for this [type of injury.]" (Ex. 1 at 17.) He further opined that the "average is four months." *Id.* On cross-examination, Dr. Roberts averred that he did not opine that the four-month average recovery time specifically applied to Mr. Thompsen's situation. (Ex. 1 at 27.) He testified Mr. Thompsen would have certainly been off work for some time following his injury, but his March 5, 2015 note stating that people typically recover to full duty after three or four months was speculation on his part with regard to Mr. Thompsen. (Ex. 1 at 28, 29.)

On redirect examination, Dr. Roberts further explained his opinion by stating Mr. Thompsen was certainly able to return to light duty as of November 19, 2014. (Ex. 1 at 30.) On December 3, 2014, Mr. Thompsen was not reporting significant problems, and Dr. Roberts stated that at that point, he would typically return an employee to full duty. (Ex. 1 at 30, 31.) With regard to Mr. Thompsen's particular situation, Dr. Roberts opined that prior to three months, he would not have been able to work full duty and at five months he would have been able to do so. He went on to state that "between three and four months he probably could have been at light duty and then at between four months and after probably was back at regular duty." (Ex. 1 at 33.) However, he again stated that was "only speculation." *Id.* Mr. Thompsen testified he believed he had recovered sufficiently to return to full duty after four months.

With regard to medical expenses, Dr. Roberts testified that the total incurred for treatment of Mr. Thompsen, including the medical bills for anesthesia and imaging that remained unpaid, were reasonable and necessary for treatment of Mr. Thompsen's work injury. (Ex. 1 at 24.) He also testified his deposition fee of $750.00 was reasonable for the local medical community. *Id.* In addition to this expense, Mr. Thompsen also submitted court reporter expenses for Dr. Roberts' deposition as well as party depositions in the amount of $1,050.50.

### Findings of Fact and Conclusions of Law

The Court considers the following legal principles in reaching its conclusions in this matter. The Court must interpret the Workers' Compensation Law fairly, impartially

and in accordance with basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2015). The employee in a workers' compensation claim, has the burden of proof on all essential elements of a claim. *See Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015).

The primary issue in this matter is whether Mr. Thompsen was acting as an employee of Concrete Solutions or an independent contractor at the time of his work injury on July 10, 2014. Tennessee Code Annotated section 50-6-102(12)(D)(i) (2015) sets forth the following factors for making this determination as follows:

*(a)*     The right to control the conduct of the work;
*(b)*     The right of termination;
*(c)*     The method of payment;
*(d)*     The freedom to select and hire helpers;
*(e)*     The furnishing of tools and equipment;
*(f)*      Self-scheduling of working hours; and
*(g)*     The freedom to offer services to other entities.

In *Smiley v. Four Seasons Coach Leasing, Inc., et al.,* Nos. 2016-06-0104, 2016-06-105, 2016 Wrk. Comp. App. Bd. LEXIS 28, at *10-11 (Tenn. Workers' Comp. App. Bd. July 15, 2016), the Appeals Board summarized the long-standing analysis used in determining whether a worker is an employee or independent contractor, explaining, "These factors are not absolutes that preclude examination of each work relationship as a whole and are no more than a means of analysis." Further, "While no single factor is determinative, the Tennessee Supreme Court has repeatedly emphasized the importance of the right to control, the relevant inquiry being whether the right existed, not whether it was exercised." *Id.* Moreover, determining whether an individual is an employee or an independent contractor "specialized factual analysis," and, "No single aspect of a work relationship is conclusive in making this determination. . . . [T]he trier of fact must examine all relevant factors and circumstances of the relationship." *Id.* Finally, "The fact that a company did not deduct social security or income taxes is not a controlling factor in deciding whether an employer-employee relationship existed." *Id.*

In this matter, the analysis supports Mr. Thompsen's contention that he was an employee of Concrete Solutions at the time of his injury on July 10, 2014. While Mr. Thompsen did have the authority to control many, if not most, aspects of the day-to-day activities involving the construction of the concrete home, Concrete Solutions hired him as a supervisor to do just that. If Concrete Solutions' theory were correct, any employee with supervisory duties would be at risk of being declared an independent contractor as opposed to an employee. Furthermore, Mr. Turney admitted he retained ultimate authority regarding how the work was to be performed. Thus, Mr. Turney retained the right to control the day-to-day aspects of the work, whether or not he exercised it. *Id.*

6

Mr. Thompsen had the authority to hire and fire employees. However, he terminated the former supervisor with Mr. Turney's express consent. Furthermore, while he did hire two employees to assist with the project, he did so on behalf of Concrete Solutions, which paid both employees a weekly paycheck based on hours worked. Mr. Thompsen was not responsible for paying them. Once again, Mr. Thompsen acted as a supervisor for Concrete Solutions as opposed to an independent contractor.

Mr. Turney conceded Concrete Solutions provided and paid for almost all of the equipment and supplies used for the project. With regard to scheduling working hours, while there was some schedule revision to accommodate the weather, the parties agreed Mr. Thompsen's job duties required him to be on the jobsite forty hours per week if possible. Although Mr. Turney testified Mr. Thompsen was free to work on other projects while working on the concrete home, his work schedule with Concrete Solutions made such a proposition unrealistic.

Mr. Thompsen was not paid a set amount, nor was his pay based on the completion of the project. He received a weekly paycheck based on an hourly rate, which is more consistent with an employee than an independent contractor. While the decision to pay and receive pay as a "1099 contractor" weighs in favor of Mr. Thompsen being an independent contractor, it is not enough to outweigh the other factors. *See Smiley,* at *14.

In addition, the testimony does not even support the proposition that it was ever the intention of the parties that Mr. Thompsen work as an independent contractor. Mr. Thompsen testified he left a full-time position with another construction company to work for Concrete Solutions, and he would not have done so without the assurance of employment after completing the concrete home. He further testified he was unaware he would be required to sign a 1099 until after he agreed to work for Concrete Solutions, and even then Mr. Turney assured him this would only be until he was on surer footing with regard to his business. Mr. Turney did not refute this testimony.

Furthermore, Mr. Turney admitted the only reason he required a 1099 from those working for Concrete Solutions was that he was not adept at bookkeeping, and it was "easier" to do it that way. Once his wife began working full-time for Concrete Solutions, all the workers were immediately given the option of having payroll deductions taken out of their checks. Although two workers chose not to do so, Mr. Turney testified the only difference between them and "employees" was that Concrete Solutions would give the "employees" precedence with regard to available work.

Finally, Mr. Turney testified he hired Mr. Thompsen for his expertise in vertical concrete and that future employment was contingent upon the availability of work following the conclusion of the project. However, the link between availability of work

and continued employment is true of any "at will" employment relationship and does not persuade the Court that Mr. Turney intended to employ Mr. Thompsen only for the concrete home project.

Therefore, pursuant to Tennessee Code Annotated section 50-6-102(12)(d)(i) (2015), the Court finds Mr. Thompsen was an employee at the time of his work-related injury on July 10, 2016, and is thus entitled to workers' compensation benefits arising from that injury.

With respect to temporary total disability benefits, an employee must prove (1) total disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability. *Shepherd v. Haren Const. Co., Inc., et al.,* No. 2015-01-0325, 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (Tenn. Workers' Comp. App. Bd. Mar. 30, 2016). Where the disability is not total, an employee may recover temporary partial disability benefits if the employee "is able to resume some gainful employment but has not reached maximum recovery." *Id.* (quoting *Williams v. Saturn Corp.,* No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005)); *and see* Tenn. Code Ann. § 50-6-207(2) (2015). Temporary restrictions assigned by physicians during an injured worker's medical treatment do not establish an entitlement to continued temporary disability benefits if the employee is able to work without loss of income. *Shepherd,* at *14.

In this instance, Dr. Roberts provided the only medical proof regarding Mr. Thompsen's temporary disability resulting from his work injury. He testified that Mr. Thompsen was clearly able to return to light duty employment as of November 19, 2014, the date he wrote the note for Mr. Thompsen. (Ex. 1 at 30.) However, Mr. Thompsen's testimony was that he returned to work for Concrete Solutions on September 8, 2014, and worked for two weeks, albeit in a limited capacity, at wages greater than his pre-injury wage. Therefore, the Court finds Mr. Thompsen's injury rendered him temporarily totally disabled from July 11, 2014, until September 7, 2014, and he is entitled to benefits at the stipulated compensation rate of $321.66. *Shepherd,* at *13.

With regard to temporary partial disability, Dr. Roberts testified that "on average" it takes four months for a person to sufficiently recover from the type of injury sustained by Mr. Thompsen to return to full duty. (Ex. 1 at 17.) He further opined that at some point after four months, Mr. Thompsen was "probably" recovered enough to return to full duty. (Ex. 1 at 33.) In addition to Dr. Roberts' testimony, Mr. Thompsen also testified that he felt he had recovered enough to return to full duty after four months. "The testimony of the employee as to his or her physical limitations must always be taken into consideration." *Lambdin v. Goodyear Tire & Rubber Co.,* 468 S.W.3d 1, 13 (Tenn. 2015).

Thus, considering Dr. Roberts' opinions along with Mr. Thompsen's unrefuted lay testimony, the Court finds Mr. Thompson proved he was temporarily partially disabled from at least September 8, 2014, until November 10, 2014, less the two weeks Concrete Solutions employed him, which is four months from the date of his injury when combined with his period of total disability. Therefore, he is entitled to two-thirds of the difference between the wages he could earn in his partially disabled state and his average weekly wage. *See* Tenn. Code Ann.§ 50-6-207(2)(A) (2015). Given that Concrete Solutions had no work for him after September 8, 2014, the wages he was able to earn during that period were effectively $0. As a result, he is entitled to temporary partial disability benefits from September 22, 2014, until November 10, 2014, equating to his full compensation rate of $321.66. *See Williams,* at *6. Therefore, the Court finds Concrete Solutions is obligated to pay Mr. Thompsen a total of $4,962.75 in temporary disability benefits.

With regard to permanent partial disability benefits, the parties stipulated Mr. Thompsen had a two-percent impairment to the body as a result of his work-related injury. They further stipulated that he was over the age of forty and that he did not return to work at a wage equal to or greater than his pre-injury wage before his compensation period ended. Therefore, pursuant to Tennessee Code Annotated section 50-6-207(3) (2015), Mr. Thompsen is entitled to permanent partial disability benefits in the amount of $4,698.80.

With regard to medical treatment and expenses, Concrete Solutions agreed to allow Dr. Roberts to treat Mr. Thompsen and paid for most of the medical expenses incurred through his treatment. As a result, Dr. Roberts is designated as Mr. Thompsen's authorized treating physician for any further medical treatment made reasonable and necessary by Mr. Thompsen's work injury. Tenn. Code Ann. § 50-6-204(a)(1)(A) (2015). Dr. Roberts' undisputed testimony was that the expenses for anesthesia and imaging services, which remain unpaid, were both reasonable and necessary for care of Mr. Thompsen's work injury. As a result, Concrete Solutions shall pay these medical expenses, totaling $684.00.

The Court finds Mr. Thompsen's discretionary costs in the amount of $1,800.50 to be reasonable, and Concrete Solutions shall reimburse these costs to Mr. Thompsen. The Court awards Mr. Thompsen's attorney fees in the amount of twenty percent of the total disability benefits, totaling $1,932.31 pursuant to Tennessee Code Annotated section 50-6-226 (2015). Court costs in the amount of $150.00 are assessed against Concrete Solutions for which execution may issue if necessary.

IT IS, THEREFORE, ORDERED as follows:

1.    Concrete Solutions shall pay Mr. Thompsen $4,962.75 in temporary disability benefits and $4,698.80 in permanent partial disability benefits.

2.    Dr. Gregory Roberts shall be Mr. Thompsen's authorized treating physician for any additional reasonable and necessary medical care he may require for his work-related injury of July 10, 2014.

3.    Concrete Solutions shall pay additional medical expenses in the amount of $684.00.

4.    Concrete Solutions shall pay Mr. Thompsen's discretionary costs in the amount of $1,800.50.

5.    Mr. Thompsen's counsel, Greg Groth, is awarded $1,932.31 in attorney's fees, which is the equivalent of twenty percent of the disability benefits awarded to Mr. Thompsen.

6.    Concrete Solutions shall prepare and submit the SD-1 for this matter within ten days of the date of Judgment and shall pay court costs in the amount $150.00 for which execution may issue if necessary.

**ENTERED THIS THE 25th DAY OF July, 2016.**

**Robert V. Durham, Judge**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, this Order will become final by operation of law thirty calendar days after entry, pursuant to Tennessee Code Annotated section 50-6-239(c)(7).**

# APPENDIX

Exhibits:

1.  Deposition of Dr. Gregory Roberts with attachments; and,
2.  Itemization of discretionary costs.


Technical Record:

1.  Petition for Benefit Determination;
2.  Mr. Thompsen's Pre-Compensation Hearing Statement; and,
3.  Dispute Certification Notice.


# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order Granting Benefits was sent to the following recipients by the following methods of service on this the 25th day of July, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Gregory Groth | | | X | greg@greggrothlaw.com |
| Nicholas Akins | | | X | nakins@morganakins.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov