# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 18, 2016 Session

## KEN BUCKNER ET AL. v. MIKE GOODMAN ET AL.

**Appeal from the Chancery Court for Bradley County**
**No. 2014-CV-262     Jerri S. Bryant, Chancellor**

---

**No. E2016-00150-COA-R3-CV-FILED-DECEMBER 29, 2016**

---

This case involves a contract to purchase a home on the sellers' condition that the home be removed from the sellers' real property at the buyers' expense. The sellers and the buyers entered into a written contract on January 25, 2013, at which time the buyers paid a $2,500 deposit toward an agreed price of $5,000 for the home. The contract did not set forth a deadline for the home to be removed from the sellers' property, although the sellers were required to demonstrate to the lender financing their new construction loan that the home had been removed. The buyers contacted several potential house movers to transport the home but did not execute a final written contract with any of them. The sellers subsequently entered into a written agreement with movers who had originally been contacted by the buyers, retaining the movers to "take possession" of the home and transport it but providing the original buyers a first option to purchase. After learning of the agreement between the sellers and the movers, the buyers contacted the movers, "firing" them. The sellers then had the home demolished. The buyers filed a complaint against the sellers, alleging breach of a home sales contract. The sellers filed a counter-complaint, alleging that the buyers had materially breached the contract first by failing to timely remove the home. The buyers subsequently filed a second complaint against the movers, alleging intentional interference with contractual relations. The trial court consolidated the two actions. Following presentation of the buyers' proof during a bench trial, the trial court found that the buyers had materially breached the contract. The court granted the sellers' and the movers' respective motions for involuntary dismissal pursuant to Tennessee Rule of Civil Procedure 41.02. Upon hearing the sellers' evidence regarding damages, the court entered a judgment in favor of the sellers in the amount of $5,200, comprised of $7,700 in total damages offset by the $2,500 previously paid by the buyers. The buyers timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

William J. Brown, Cleveland, Tennessee, for the appellants, Ken Buckner and Brenda Buckner.

James F. Logan, Jr., Cleveland, Tennessee, for the appellees, Mike Goodman and Cindy Goodman.

Jerrold L. Becker, Knoxville, Tennessee, for the appellees, Hugh Edward Mayes and Kay Mayes d/b/a B&B Construction/B&B Moving and Foundation Services.

**OPINION**

I.  Factual and Procedural Background

In November 2013, defendants Mike Goodman and Cindy Goodman ("the Goodmans") were building a new home, intending to replace the approximately 1,500-square-foot home ("the Home") in which they had been residing on their real property located at 1192 Hunt Road in Cleveland, Tennessee ("the Property").  The Goodmans placed a notice in the *Tennessee Trader*, a classified advertising circular, stating that they were offering the existing house for sale "[t]o be moved off property."  The plaintiffs, Ken Buckner and Brenda Buckner ("the Buckners"), contacted the Goodmans on November 27, 2013.  Over the telephone, Ms. Buckner and Mr. Goodman agreed on a purchase price of $5,000 for the Home, provided that the Buckners would remove the Home from the Property and pay the attendant cost.

On January 25, 2013, the Buckners and the Goodmans entered into a written contract ("the Contract"), and the Buckners paid a $2,500 deposit toward purchase of the Home.  The Contract, which was drafted in handwritten form by Ms. Goodman, was signed by Mr. Buckner as the "Buyer" and both Mr. and Ms. Goodman as the "Seller[s]."[1]  The text of the Contract states in full:

---

[1] Although Ms. Buckner did not sign the Contract, it is undisputed that she was a party to the agreement between the Buckners and the Goodmans.  Furthermore, we determine that Ms. Buckner was a party to the agreement based on her testimony that she initially negotiated the price, subsequently reviewed the Contract after its execution, and agreed with the written terms as she understood them.  *See Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) ("[A] written contract is not required to be signed to be binding on the parties."); *cf. Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 678 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Aug. 13, 2007) (determining that a party's wife who had not signed the contract at issue was not a party to the contract based on "the absence of her signature, the wording of the document itself, and the surrounding circumstances . . . .").

Mike & Cindy Goodman has sold the brick home located at 1192 Hunt Rd. Cleveland. TN to Ken Buckner for the amount of $5000.00 dollars. The house is sold as is and will be moved off the property.

A deposit of $2500.00 has been paid. Remainder will be paid when house is moved.

The Goodmans filed a notice of completion for their newly constructed home with their lender on January 14, 2013. The parties' respective testimonies differed as to when an understanding existed between the Buckners and the Goodmans that the original Home needed to be moved by a certain date. Mr. Goodman testified via deposition that in early January, he informed Mr. Buckner that the Home had to be moved soon because the Goodmans' construction loan period was ending. According to Mr. Goodman, Mr. Buckner told him that a mover had given him a date of February 4, 2013, to move the Home. Mr. Goodman stated that he then set the closing on the Goodmans' construction loan for ten days following this date, or February 14, 2013.

Testifying during trial, Mr. Buckner denied that he had a mover identified on February 4, 2013. According to Mr. Buckner, he and his wife did not learn of any specific time period for moving the Home until Mr. Goodman called him on January 29, 2013, four days following the Contract's execution, and informed him that the lender was requiring the Goodmans to have the Home removed from the Property by February 14, 2013, in order to convert the construction loan to permanent financing. Mr. Buckner maintained that he told Mr. Goodman he would "try" to have the Home removed by February 14, 2013, but did not promise this would be accomplished.

The Buckners contacted at least three potential house movers regarding removal of the Home to acreage owned by the Buckners in Cleveland. Prior to execution of the Contract and upon Mr. Goodman's recommendation, the Buckners initially contacted a mover named Tom Rutledge regarding an estimate to move the Home, but the Buckners and Mr. Rutledge were unable to reach an agreement. The Buckners then contacted a potential mover named Donald Payne. Mr. Buckner testified that he met Mr. Payne at the Home on January 6, 2013, and that he and Mr. Payne inspected the Home after being admitted by Ms. Goodman's mother. According to Mr. Buckner, the Home was "packed clean to the ceiling with boxes" at that time, and Mr. Payne said he would not be able to commit to the move because he was scheduled to leave the country a few days later.

Mr. Buckner further testified that on February 2 or 3, 2013, he contacted defendants Edward and Kay Mayes d/b/a B&B Construction and B&B Moving and Foundation Services ("the Mayeses"), regarding potentially hiring them to move the

Home.  Although Ms. Mayes testified that this initial contact occurred on February 1, 2013, while Mr. Mayes stated it occurred on February 5, 2013, it is undisputed that the Mayeses sent a proposed contract to the Buckners via facsimile on February 6, 2013, with a total estimated price for moving the Home of $21,000.  According to Mr. Buckner, he contacted Ms. Mayes via telephone the same day and stated that he did not agree with some provisions of the proposed contract.  She told him to mark his proposed changes and return it.  The Buckners maintained that they returned a marked version of the contract to the Mayeses via facsimile on February 8, 2013.  According to Mr. and Ms. Buckner's respective testimonies, they repeatedly attempted to contact the Mayeses prior to February 14, 2014, but received no response except for one brief telephone conversation with Mr. Mayes during which he said that he would get back to Mr. Buckner.  Mr. Buckner testified that he made initial contact with three other house movers while waiting for a response from the Mayeses.

In contrast, the Mayeses, testifying via deposition, each respectively claimed never to have seen the Buckners' marked version of the proposed contract until it was produced during the pre-trial discovery process.  Mr. Mayes testified that following Mr. Buckner's initial contact, he met Mr. Buckner at the Property on February 5, 2013, viewed the Home, and then drove to the Buckners' property to which the Home purportedly would be moved.  According to Mr. Mayes, Mr. Buckner informed him that he had only seven days to move the Home.  Mr. Mayes testified that following his visits to the Goodmans' and Buckners' respective properties, still on February 5, 2013, he told Mr. Buckner that he would not be able to move the Home within seven days because of obstacles posed by power lines, trees, and the Property's topography.  Mr. Mayes also stated that he advised Mr. Buckner that a permit would be needed from "environmental health" before the Home could be placed on the Buckners' property.  Mr. Mayes maintained that he told Mr. Buckner on February 5, 2013, that he would speak to Mr. Goodman in an attempt to determine whether anything could be done to extend the February 14 deadline.  According to Mr. Mayes, he spoke to Mr. Buckner "several times" over the next few days.  It is undisputed that the Mayeses and the Buckners never entered into a contract or reached an agreement.

Mr. Goodman testified at trial that he and his wife obtained an extension on the closing date of their construction loan to February 25, 2013, for which they had to pay a $1,000 penalty.  They were also required to pay $100 per day in additional interest fees.  Mr. Goodman stated that while he was contemplating the need to obtain an extension, he contacted Mr. Buckner via telephone on February 12 or 13, 2013, and offered him an extension of time to move the Home if he would pay the $1,000 penalty.  According to Mr. Goodman, Mr. Buckner agreed over the telephone to pay the $1,000 penalty the next day in person but then failed to appear or provide the penalty fee.

In the meantime, Mr. Mayes and Mr. Goodman came to an understanding on February 14, 2013, that if the Home could be moved to a parcel of land owned by the Goodmans that was adjacent to the Property at issue, the Goodmans' lender would be satisfied and the Buckners could be allowed additional time to move the Home to their property. On February 15, 2013, the Goodmans and the Mayeses entered into a written agreement ("Goodman-Mayes Agreement"), "confirming [their] conversation and agreement by telephone on Thursday, February 14, 2013 . . . ." According to the Goodman-Mayes Agreement, the Mayeses, doing business as B&B House Movers, would "take possession" of the Home and "remove the house to the lot adjacent of the right side of existing house to location on the same property to be determined by Mr. Goodman to serve as a staging area until house can be moved to permanent location." The Goodman-Mayes Agreement provided that Mr. Buckner was granted a "first option to purchase the said house for a move bill plus expenses of removing telephone lines, power poles and any utilities." The Goodman-Mayes Agreement further provided that upon sale of the Home by B&B House Movers, Mr. Goodman would receive "a minimum of $3,000 for his interest in said house with an option for an additional percentage to be agreed upon." If the Home did not sell within sixty days after removal to the adjacent lot, the Goodman-Mayes Agreement provided that the Mayeses would begin making a lease payment of $350 per month to the Goodmans.

At trial, the Buckners presented two voice mail recordings left on Ms. Buckner's cellular telephone. In the first, dated February 14, 2013, Mr. Mayes explained the agreement reached by the Mayeses and Goodmans, stating that he would sell the Home to the Buckners for the "move bill." In the second voice mail, dated February 15, 2013, Ms. Mayes repeated an explanation of the agreement and stated that the Buckners would have an "option" to purchase the Home. In his deposition testimony, Mr. Mayes testified that he spoke with Mr. Buckner for thirty to forty-five minutes during the evening of February 14, 2013, attempting to explain his intention to preserve the Home and resolve the situation favorably for everyone involved. It is undisputed that Mr. Buckner subsequently telephoned Ms. Mayes and stated that the Mayeses were "fired if they had anything to do with the house."[2]

Mr. Buckner testified that he also spoke to Mr. Goodman via telephone on February 15, 2013, and expressed his belief that he and Ms. Buckner had already purchased the Home when they paid $2,500 and signed the Contract. It is undisputed that Mr. Goodman offered to return the $2,500 to the Buckners during this conversation and that Mr. Buckner refused to accept a refund. According to Mr. Goodman, Mr. Buckner then told him to "keep the money and tear the house down." At trial, Mr. Buckner denied having made this statement. Mr. Goodman acknowledged that the ultimate decision to

---

[2] Although Ms. Mayes testified that Mr. Buckner "fired" them on the morning of February 14, 2013, Mr. Mayes and Mr. Buckner each respectively testified that this conversation occurred on February 15, 2013.

demolish the Home was his.  He and Mr. Mayes each respectively testified that Mr. Mayes, after receiving the message that Mr. Buckner had called and "fired" the Mayeses, called Mr. Goodman and advised him that he might need to demolish the Home in order to avoid a lawsuit.

On February 16, 2013, the Goodmans had the Home demolished and removed in pieces.  Mr. Goodman informed the Buckners of the demolition on February 23, 2013, through a voice mail, again offering to return the Buckners' $2,500 deposit to them.  The Buckners did not accept a return of the deposit.  Mr. Buckner testified that he previously had learned of the demolition on February 16, 2013, through a telephone call from his daughter, who had witnessed a portion of the demolition.

On February 27, 2013, the Buckners filed a complaint against the Goodmans, alleging breach of the Contract for sale of the Home.  The Goodmans filed an answer and counter-complaint on July 13, 2013, alleging that the Buckners had materially breached the Contract by failing to timely remove the Home from the Property.  On November 19, 2014, the Buckners filed a complaint against the Mayeses, alleging common law and statutory claims for intentional interference with contractual relations and requesting treble damages pursuant to Tennessee Code Annotated § 47-50-109.  Upon the Buckners' motion, the trial court consolidated the two actions in an order entered May 20, 2015.

The trial court conducted a trial over the course of two days on September 16, 2015, and October 8, 2015.  Mr. and Ms. Buckner each respectively testified.  In addition, the parties stipulated to admission of Mr. and Ms. Goodman's respective deposition testimonies and redacted versions of Mr. and Ms. Mayes's respective deposition testimonies as exhibits.  In an attempt to demonstrate their damages, the Buckners called a certified home appraiser, Billy Thacker, to testify to the value of the Home.  The Buckners had retained Mr. Thacker to estimate the value of the Home in January 2013. Using what he termed a "cost approach," Mr. Thacker estimated the value of the Home on its foundation on the Property as $87,528.  To estimate the value of the Home if it were removed from the foundation and placed on "rails" to be moved, Mr. Thacker stated that he would deduct $21,000 for the cost of the move and $12,000 for the brick material that would be removed, for a total estimated value of $54,000.  Mr. Thacker acknowledged that he had not performed a full walk-through appraisal and had reached his estimate by viewing a photograph of the Home.

Following presentation of the Buckners' proof, the Goodmans and the Mayeses each respectively moved for involuntary dismissal of the Buckners' complaints pursuant to Tennessee Rule of Civil Procedure 41.02.  The trial court granted the motions and dismissed the Buckners' complaints with prejudice upon finding that the Buckners had "caused the breach of the contract to the Goodmans by failing to get the house moved

within the time allotted," which the court found to have ended on February 14, 2013. The court also found that the Mayeses could not have interfered with the Contract because the Contract was no longer enforceable at the time the Mayeses entered into the Goodman-Mayes Agreement. The court further found that the Buckners had failed to establish an intent to induce a breach or any malicious behavior on the part of the Mayeses. Prior to granting the motions for involuntary dismissal, the court also found that Mr. Thacker's valuation of the Home was too speculative to be probative, stating: "The plaintiff bargained for a house for $5,000 and that's the only proof of what value it would have been."

Proceeding with trial, still on October 8, 2015, the trial court heard evidence presented by the Goodmans on their breach of contract claim, including testimony by Mr. Goodman. Upon finding that the Buckners had breached the Contract by failing to timely remove the Home from the Property, the court further found that the Goodmans had incurred a total of $7,700 in damages, including $6,000 for the cost of removal; a $1,000 penalty to extend their construction loan; and $700 in interest fees, consisting of $100 per day for seven days. Offsetting the damages by the $2,500 the Buckners previously had paid toward purchase of the Home, the court entered a judgment in the amount of $5,200 in favor of the Goodmans. The Buckners timely appealed.

## II. Issues Presented

The Buckners present three issues on appeal, which we have restated as follows:

1. Whether the trial court erred by finding that the Buckners materially breached the Contract by failing to remove the Home from the Property by February 14, 2013.

2. Whether the trial court erred by dismissing the Buckners' claim against the Mayeses for intentional interference with contractual relations between the Buckners and the Goodmans.

3. Whether the trial court erred by declining to accept testimony proffered by the Buckners' expert witness regarding the fair market value of the Home when removed from the foundation.

The Goodmans present two additional issues, which we have similarly restated as follows:

7

4. Whether the trial court erred by granting the Goodmans' motion to dismiss the Buckners' claim of breach of contract against the Goodmans.

5. Whether the Buckners' appeal is frivolous such that the Goodmans are entitled to an award of attorney's fees and costs on appeal pursuant to Tennessee Code Annotated § 27-1-122.

Finally, the Mayeses present two additional issues, which we have restated as follows:

6. Whether the Buckners have failed to comply with the requirements of Tennessee Rule of Appellate Procedure 27(a)(7) such that they have waived their appeal of the trial court's dismissal of the claim for intentional interference with contractual relations, or in the alternative, whether the Buckners have waived their appeal of the common law claim regarding this tort by presenting argument solely in support of a statutory claim pursuant to Tennessee Code Annotated § 47-50-109.

7. Whether the Buckners' appeal is frivolous such that the Mayeses are entitled to an award of attorney's fees and costs on appeal pursuant to Tennessee Code Annotated § 27-1-122.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). Likewise, our review of the trial court's decision to grant a Tennessee Rule of Civil Procedure 41.02 motion for involuntary dismissal is also *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Boyer v. Heimermann*, 238 S.W.3d 249, 254 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Aug. 13, 2007) ("This standard is appropriate because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence.").

As this Court has explained:

> When a motion for involuntary dismissal is made at the conclusion of the plaintiff's proof in a bench trial, "the trial court must impartially weigh the evidence as though it were making findings of fact and conclusions of law after all the evidence has been presented." *Building Materials Corp. v. Britt,* 211 S.W.3d 706, 711 (Tenn. 2007); *Thompson v. Hensley,* 136 S.W.3d [925,] 929 [(Tenn. Ct. App. 2003)]; *see also Burton v. Warren Farmers Coop.,* 129 S.W.3d at 520. If a plaintiff has failed to demonstrate her right to relief by a preponderance of the evidence under the facts as found by the court and pursuant to the applicable law, then the case should be dismissed. *Building Materials Corp. v. Britt,* 211 S.W.3d at 711; *Burton v. Warren Farmers Coop.,* 129 S.W.3d at 520-21.

*Boyer,* 238 S.W.3d at 254.

We review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). While "'the amount of damages to be awarded in a particular case is essentially a fact question,'" "'the choice of the proper measure of damages is a question of law . . . .'" *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (quoting *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998), *Beaty abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, ___ S.W.3d ___, No. M2015-00762-SC-R11-CV, 2016 WL 5491022 (Tenn. Sept. 29, 2016)).

We note that prior to granting the motions for involuntary dismissal in the instant action, the trial court was presented with live testimony from the Buckners and their expert witness while reviewing solely deposition testimony from the Goodmans and the Mayeses, the admission of which was stipulated to by all of the parties. Mr. Goodman did testify in person during the damages portion of the trial. The trial court's determinations regarding witness credibility during live testimony are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Lambdin v. Goodyear Tire & Rubber Co.*, 468 S.W.3d 1, 10 (Tenn. 2015); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002). However, we review the trial court's determinations regarding witness credibility during deposition testimony *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Lambdin*, 468 S.W.3d at 10.

IV. Breach of Contract

The Buckners contend that the trial court erred in finding that they materially breached the Contract by failing to remove the Home from the Property by February 14, 2013. The court thereby found that the Buckners could not recover damages from the Goodmans under the Contract because the Buckners committed the first material breach. *See Madden Phillips Constr, Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. Mar. 15, 2010) ("Ordinarily, a party who first materially breaches may not recover under the contract."). The Buckners specifically argue that the Contract contained no indication of a time deadline or provision that time was of the essence for removal of the Home. Although the Buckners phrase this issue in terms of whether the court erred by finding them in breach of contract, the Goodmans directly raise the related issue of whether the court then erred by granting the Goodmans' motion to dismiss the Buckners' complaint against the Goodmans. The Goodmans argue that the trial court properly dismissed the Buckners' complaint because removal of the Home by the initial closing date of the Goodmans' construction financing was a material part of the contract. Upon our thorough review of the record and applicable authorities, we determine that the evidence preponderates in favor of the trial court's findings that a reasonable timeframe for removal of the Home was implied by the Contract and that the Buckners had been given sufficient notice that this reasonable timeframe would end on February 14, 2013.

"In a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters,* 354 S.W.3d 287, 291 (Tenn. 2011). In this action, it is undisputed that the January 25, 2013 Contract between the Buckners and Goodmans was a valid and enforceable contract at the time of its execution. It is also undisputed that neither the Buckners nor the Goodmans fully performed according to the Contract. Regarding the significance of determining which party to a contract committed the first material breach, this Court has explained:

> A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.,* 715 S.W.2d 41, 47 (Tenn. 1986); *Cummins v. McCoy,* 22 Tenn. App. 681, 691, 125 S.W.2d 509, 515 (1938). Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach. *See* Restatement (Second) of Contracts § 237 comment b (1979).

*McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). *See also Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at \*5 (Tenn. Ct. App. Dec. 22, 2009) ("When one party to a contract materially breaches the same, is unable to perform, or manifests an intention to no longer be bound by the contract, the non-breaching party is excused from further performance.").

Factors to consider when determining whether a party's breach of a contract is material include:

> (a)    the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b)    the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c)    the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d)    the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e)    the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*McClain*, 806 S.W.2d at 199 (quoting Restatement (Second) of Contracts § 241 (1979)); *see also Markow*, 2009 WL 4980264, at \*5.

In interpreting a contract, our "initial task is to determine whether the language in the contract is ambiguous." *Ray Bell*, 356 S.W.3d at 386-87 (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell*, 356 S.W.3d at 387 (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). This Court has explained the principles applied to determine whether the contract language is clear or ambiguous as follows:

> The language in dispute must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly

construed in more than one way. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.*

*VanBebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Mar. 3, 2008). It is well-settled that "ambiguities in a contract are to be construed against the party drafting it." *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995). "The parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) (quoting *GRW Enters. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)). However, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson,* 195 S.W.3d 609, 612 (Tenn. 2006).

As the Buckners note, the Contract, drafted by Ms. Goodman, omitted any mention of a timeframe for removal of the Home. The text of the Contract provided in full:

> Mike & Cindy Goodman has sold the brick home located at 1192 Hunt Rd. Cleveland. TN to Ken Buckner for the amount of $5000.00 dollars. The house is sold as is and will be moved off the property.
>
> A deposit of $2500.00 has been paid. Remainder will be paid when house is moved.

The Buckners argue that the omission of a timeframe for removal constituted an unambiguous agreement that time was not a material term of the Contract. They thereby argue that the trial court erred by considering parol evidence concerning any agreement between the Buckners and the Goodmans as to a deadline for the Home to be moved. We disagree.

> As this Court has explained:
>
> [W]here the parties have unambiguously set out the terms of their agreement, courts will enforce those terms as written, regardless of any inequity arising from that enforcement. On the other hand, courts may incorporate a reasonableness requirement into any contract. *Moore v. Moore,* 603 S.W.2d 736 (Tenn. Ct. App. 1980). In *Moore,* this court was

called upon to interpret a provision in a real estate sales contract that made the contract contingent upon the buyer's "ability to obtain adequate financing." The proof showed that although the buyer was unable to secure financing in Shelbyville, where the property was located, he was able to obtain adequate financing in Nashville. In this factual context, the court stated that, "a qualifying word which may be read into every contract is the word 'reasonable,' or its equivalent 'reasonably.'" *Id.* at 739. Consequently, the court interpreted the contingency as meaning "reasonable ability to obtain sufficient financing by ordinary, recognized means." *Id.* The court then found that the contract was subject to reasonable application of the words used therein "according to the known situation of the parties," but was not ambiguous. *Id.*

The *Moore* court's language that reasonableness may be read into every contract has been quoted, cited, and applied in a number of cases decided by this court. *See, e.g., Hurley v. Tenn. Farmers Mut. Ins. Co.,* 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995) (holding that insurance company's demand for production of financial records and assertion that insured's failure to produce was a breach of the cooperation clause of the insurance contract could be considered unreasonable). In fact, in some instances, we have stated that the qualifying word "reasonable" *must* be read into every contract. *Minor v. Minor,* 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). In *Minor,* because the contract did not include a time for performance, a reasonable time was implied, based upon *Moore* and upon the well-settled rule that missing contract terms may be implied. *Id.* In *McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 198 (Tenn. Ct. App. 1991), this court held that "the extent of contractual obligations should be tempered by a 'reasonableness' standard," citing *Moore.*

*Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003), *perm. app. denied* (Tenn. June 1, 2004) (underlined emphasis added).

In its ruling at the close of the Buckners' proof, subsequently incorporated into the final order, the trial court found that the Contract "does not contradict what the parol[] testimony is about the terms of the agreement between the parties but there was no term of time in the receipt or the document." Regarding the testimonial evidence concerning the purported deadline for removal, the trial court stated in pertinent part:

[W]hen I'm looking at the balance of the testimony between the Buckners and Mr. Goodman . . . I find that the evidence supports Mr. Goodman's version that Mr. Buckner knew that [the Home] had to be off by February

13

the 14th at the worst and possibly he knew that he was supposed to get it off – if I take Mr. Goodman's version of the facts as true, which is a different version that's not been totally denied by the Buckners, that [the Buckners] knew to have it off by the 4th of February and he, Goodman, set his closing date ten days after that so that it would give them time for something else to happen.

Time may not have been of the essence in the contract but it became important by the manifested intention of the parties based on this subject matter and by implication from the facts.

The parties stipulated the house was destroyed on 2/16. The Buckners knew the [Goodmans] had to get an extension on their loan because they didn't have the house off by the 14th. And if there was a contract that was binding at that point they had one more day to bring the $1,000 [for the Goodmans' loan extension penalty] and did not do so.

[The Buckners] admit they told Mayes the house had to be moved by February the 14th. Mayes sent [the Buckners] a contract and Mayes was standing ready to perform the contract but [Mr. Buckner] marked it up and made several changes that were not agreed to by Mayes. I do think at this point because of the urgency of the situation that Goodman and Mayes tried to work this out with Mr. Buckner and Mr. Buckner began accusing them of stealing the house from him and that I think was the final straw that quirked this deal.

[The Buckners] admit they were told by Mayes that they would move the house to the – that he would move the house to the adjacent lot so that the Goodmans could close and the [Buckners] could still have the house for the cost of the move. [The Buckners] refused. [The Buckners] are the one[s] who caused the breach of the contract to the Goodmans by failing to get the house moved within the time allotted. At this point the [Goodmans were] allowed to act as they please[d].

The trial court thus found that although a term of time for removal of the Home was not provided in the Contract, a reasonable time "became important by the manifested intention of the parties based on this subject matter and by implication from the facts."

When questioned during his deposition testimony regarding how the date of February 14, 2013, came to be the deadline by which the Goodmans needed the Home to be moved, Mr. Goodman stated that in order to close on their construction loan and

14

convert it to permanent financing, he and Ms. Goodman needed to demonstrate to their lender, arranged through the Bank of Cleveland, that the Home had been removed from the Property. Their construction loan was initially for a period of approximately one year, which would have expired in the spring of 2013. However, the Goodmans were concerned that they would continue to pay higher interest rates as long as the loan remained one for construction purposes. Mr. Goodman testified that during the first week of January 2013, he was under the impression that Mr. Buckner had engaged Mr. Rutledge to move the Home but had encountered a problem with a tree that would have to be removed and with a particularly tight curve on the route Mr. Rutledge believed he needed to follow. Mr. Goodman stated that he contacted a county official during this time and obtained permission for removal of the tree. He also talked to Mr. Rutledge about an alternate route for the mover to follow, which Mr. Goodman believed had solved the concern over the tight curve.

According to Mr. Goodman, it was during a telephone conversation in which he was updating Mr. Buckner regarding the tree and route concerns that Mr. Buckner stated he had not been able to reach an agreement with Mr. Rutledge, describing an incident when Mr. Rutledge purportedly became upset, at least in part because Mr. Buckner admittedly refused to enter into a contract that would require partial payment up front. Mr. Buckner, however, informed Mr. Goodman during the same telephone conversation that he had a second mover in mind.[3] When Mr. Buckner told him about the second mover, Mr. Goodman asked Mr. Buckner if the mover had quoted a date for removal of the Home from the Property. Mr. Goodman testified that he told Mr. Buckner, "we're pushing here. . . . I'm at the end of my construction, and I'm needing to wrap it up." According to Mr. Goodman, Mr. Buckner told him that "the house would be moved by the 4th of February." In response, Mr. Goodman told Mr. Buckner that he "would give [him] ten days" past February 4 and set the construction loan closing for February 14, 2013. According to Mr. Goodman, Mr. Buckner told him to go ahead and set the closing date. The Goodmans then contacted their lender and set the loan closing date for February 14, 2013. Mr. Goodman testified that once they had set the closing date, they were required to pay a $1,000 penalty and $100 per day in interest in order to change the date.

Mr. Goodman further testified that two days after the telephone call when they had agreed that the Goodmans would set February 14, 2013, for their loan closing, Mr. Buckner called to inform Mr. Goodman that the second mover was leaving the country on a mission trip and would not be able to move the Home. When questioned regarding

---

[3] Although Mr. Goodman stated that Mr. Buckner never told him the name of the second mover, Mr. Buckner's testimony regarding the corresponding time frame indicated that the second mover was Mr. Payne.

15

his response when Mr. Buckner informed him that the second mover would not be able to do the job, Mr. Goodman stated:

> I was just like, we need to get going here. We're running out of time, you know, because we're getting towards the end of January, and I'm closing on the 14th. So, you know, it's going to take a few days to get the house moved. Not even off the property, but off its foundation. So he got another mover at that time.

In contrast, Mr. Buckner testified that he and his wife did not learn until January 29, 2013, of the Goodmans' need to have the Home removed by February 14, 2013. He maintained that when he executed the Contract on January 25, 2013, Mr. Goodman told him that he "had all the time in the world" to move the Home. According to Mr. Buckner, then on January 29, 2013:

> Mike Goodman calls me and says that he had took that paper [the Contract] to his bank and that he was going to use it to do something with his financial work. I didn't go into it. But anyway, he said now, he said, I've got to have the house moved. And I think he only gave me like 14 days. He had to get the house moved in 14 days.

Mr. Buckner stated that he had told Mr. Goodman he would do the best he could to move the Home by February 14 but that he had not promised to move the Home by that date. Ms. Buckner also testified that she and her husband did not learn of the February 14, 2013 deadline until January 29, 2013.

Mr. Buckner acknowledged that when he first contacted the Mayeses regarding moving the Home, he met Mr. Mayes on the Property and informed him that the Goodmans needed the Home moved by February 14, 2013. Mr. Buckner's testimony also indicated that he had seen Ms. Goodman carrying groceries into the Goodmans' new home on the date he entered the Contract, January 25, 2013. When questioned regarding whether he knew prior to January 29, 2013, that the Goodmans were building a new house, Mr. Buckner acknowledged that he and Mr. Goodman spoke via telephone often during that time period and that Mr. Goodman said that "he was building him a new house." Moreover, the Buckners' respective testimonies demonstrated that by January 29, 2014, they definitely knew of the Goodmans' need to have the Home removed by February 14, 2014. As the trial court noted, Mr. Goodman's testimony was unrefuted that Mr. Buckner failed to provide $1,000 as reimbursement for the construction loan penalty when Mr. Goodman offered him the opportunity to do so as a means of extending the time for performance of the Contract.

We determine that the trial court properly utilized parol evidence to find that the parties' conduct and statements indicated a reasonable deadline for removal of the Home from the Property by February 14, 2013. *See Allstate Ins. Co.*, 195 S.W.3d at 612; *Pylant*, 174 S.W.3d at 156 ("Whether the term 'reasonable' is written into the contract by the parties or is implied into it by the courts, 'reasonable' does not mean unlimited."). We further determine that inasmuch as the Buckners' failure to timely remove the Home deprived the Goodmans of their reasonable expectation of timely closing on their construction loan without penalty, s*ee McClain*, 806 S.W.2d at 199, the evidence does not preponderate against the trial court's finding that the Buckners materially breached the Contract. The trial court therefore did not err by dismissing the Buckners' complaint against the Goodmans.

## V.  Intentional Interference with Contractual Relations

Regarding their complaint against the Mayeses, the Buckners contend that the trial court erred by dismissing their claim for intentional interference with contractual relations. Tennessee Code Annotated § 47-50-109 (2013) provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

*See Whalen v. Bourgeois*, No. E2013-01703-COA-R3-CV, 2014 WL 2949500, at *12 n.2 (Tenn. Ct. App. June 27, 2014) ("We note that the common law action of 'intentional interference with contractual relations' is alternatively referred to as 'procurement of breach of contract,' as well as the statutory action's title of 'inducement to breach a contract.'") (citing *Jones v. LeMoyne-Owen Coll.,* 308 S.W.3d 894, 908 (Tenn. Ct. App. 2009)).

The trial court found in its memorandum opinion that upon the Buckners' material breach of the Contract, there was no longer an enforceable contract between the Buckners and the Goodmans. The court thereby found that the Goodmans could not have committed a breach of contract caused by the Mayeses' conduct. The court also found that the Buckners demonstrated "no intent to induce a breach" and "no malicious behavior" on the part of the Mayeses. Upon our thorough review of the record, we

17

determine that the evidence preponderates in favor of the trial court's findings on this issue.

As a threshold matter, the Mayeses assert that the Buckners have waived appeal of the trial court's dismissal of this claim by failing to comply with Tennessee Rule of Appellate Procedure 27(a)(7) as it pertains to the applicable argument section of the principal brief. The Mayeses argue that because the Buckners failed to cite to the record in the relevant argument section, except for a citation to the Contract as an exhibit, and cited to only one "outdated" decision of this Court as an authority, the Buckners failed to include "citations to the authorities and appropriate references to the record . . . relied on[.]" *See* Tenn. R. App. P. 27(a)(7). In their reply brief, the Buckners have responded by explaining that they had included citations to the record in the factual section of the principal brief but had inadvertently omitted the citations from the relevant argument section. The Buckners have repeated much of their original argument concerning this issue in the reply brief with the addition of citations to the record.

The Mayeses also assert that the Buckners cited outdated law by addressing only three elements of a common law or statutory claim of intentional interference with contractual relations or inducement of breach of contract, pursuant to Tennessee Code Annotated § 47-50-109. In the decision cited by the Buckners in their principal brief, *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994), our Supreme Court stated: "In order to establish such a cause of action, a plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff." The Mayeses cite this Court's more recent decision in *Whalen*, 2014 WL 2949500, in which this Court explained:

> As to the interplay between the common law and statutory actions, our Supreme Court has explained:
>
>> Tennessee recognizes both a statutory and common law action for inducement to breach a contract, *see* Tenn. Code Ann. § 47-50-109 (2001); *Polk & Sullivan, Inc. v. United Cities Gas Co.,* 783 S.W.2d 538, 543 (Tenn. 1989), and both forms of the action are identical, except that a plaintiff asserting a common law action may recover punitive damages, instead of the treble damages mandated by the statute. *See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.,* 13 S.W.3d 343, 360-61 (Tenn. Ct. App. 1999). In order to recover on a theory of inducement to breach a

18

contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff. *See Quality Auto Parts Co. v. Bluff City Buick Co.,* 876 S.W.2d 818, 822 (Tenn. 1994); *Baker v. Hooper,* 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001).

*Whalen*, 2014 WL 2949500, at *10-11 (quoting *Givens v. Mullikin,* 75 S.W.3d 383, 405 (Tenn. 2002)).

Contrary to the Mayeses' argument on this point, the Buckners correctly state in their reply brief that the elements delineated by our Supreme Court in *Givens* and subsequently by this Court in *Whalen* are simply broken down into seven elements but do not add any new requirements to the analysis provided in *Quality Auto Parts*, a decision which has never been overturned or called into question by Tennessee appellate courts. *See id.* We determine that the Buckners have substantially complied with Tennessee Rule of Appellate Procedure 27(a)(7) in their citations to the record and to authorities such that they have not waived this issue on appeal.

The Mayeses also assert that the Buckners have waived the common law claim of intentional interference with contractual relations because they have only presented argument based on the statutory claim in their principal brief. We agree that inasmuch as the Buckners have requested treble damages, the relief available under Tennessee Code Annotated § 47-50-109, they have waived any claim to the punitive damages available under a common law claim. *See Whalen*, 2014 WL 2949500, at *10.

Regarding the merits of the Buckners' statutory claim against the Mayeses, the Buckners primarily base their argument on the Goodman-Mayes Agreement as purported proof that the Mayes interfered with the Contract between the Buckners and the Goodmans. It is undisputed that the Mayeses knew at the time they executed the Goodman-Mayes Agreement that the Goodmans previously had entered into a contract to sell the Home to the Buckners. The Buckners argue that Mr. Mayes intentionally and strategically planned to "compel" the Goodmans to sell the Home to the Mayeses instead. They also argue that Mr. Mayes subsequently interfered by advising Mr. Goodman that he might need to tear down the Home to avoid becoming embroiled in a lawsuit with the Buckners.

19

The Goodman-Mayes Agreement, executed by Mr. Goodman and Mr. Mayes on February 15, 2013, expressly stated that it was a memorialization of an agreement the two men had reached during a telephone conversation that took place on February 14, 2013. Mr. Goodman testified that the agreement first came about when Mr. Mayes called him on the night of February 14, 2013, explaining that he had not been able to move the Home by the date the Goodmans needed it removed because he had not been able to work out a contract with the Buckners. Mr. Mayes testified that prior to sending a typewritten version of the proposed Goodman-Mayes Agreement to Mr. Goodman on February 15, 2013, he discussed it with Mr. Buckner via telephone the night before. Mr. and Ms. Buckner each respectively testified that they first learned of the Goodman-Mayes Agreement when they received a voice mail message from Mr. Mayes on February 14, 2013. It is undisputed that the Buckners did not actually see a copy of the Goodman-Mayes Agreement until it was produced as part of the discovery process.

Having determined that the trial court did not err by finding that on February 14, 2013, the Buckners had materially breached the Contract by failing to remove the Home from the Property, we further determine that the evidence does not preponderate against the trial court's finding that when Mr. Goodman and Mr. Mayes initially agreed to the terms of the Goodman-Mayes Agreement, the Buckners no longer had an enforceable contract with the Goodmans. We note that the Buckners have raised no issue regarding waiver of a breach and have presented no evidence to indicate that the Goodmans waived the right to assert a first material breach. *See Madden Phillips*, 315 S.W.3d at 813 ("A non-breaching party may . . . waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach."). Barring such a waiver, the Buckners could no longer enforce the Contract against the Goodmans once the Buckners had committed the first material breach. *See Markow*, 2009 WL 4980264, at *5 ("'[T]here can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract.'") (quoting *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.,* 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997)). Thus, the Buckners were unable to establish the first element of a claim for intentional interference of a contractual relationship: the existence of an enforceable contract between them and the Goodmans at the time that Mr. Goodman and Mr. Mayes reached an agreement. *See* Tenn. Code Ann. § 47-50-109; *Givens*, 75 S.W.3d at 405.

Moreover, even assuming, *arguendo*, that an enforceable contract between the Buckners and the Goodmans still existed at the time that Mr. Mayes offered to enter into a contract with the Goodmans, we also determine that the evidence does not preponderate against the trial court's finding that the Buckners failed to establish the required elements of intent to induce a breach and malicious action. *See id.*; *see also Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3-CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004) (noting that in the context of a claim for procurement of

20

breach of a contract, malice is "'the wilful violation of a known right.'") (quoting *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept. 24, 1998)) (in turn quoting *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.*, 1986 WL 622, at *6 (Tenn. Ct. App. Jan. 2, 1986)).

Mr. Mayes testified that his intent in agreeing to move the Home for the Goodmans upon a promise that he would be paid for his work through sale of the Home, with first right of refusal in favor of the Buckners, was to find a way to meet the Goodmans' deadline while still maintaining an opportunity for the Buckners to complete the purchase. While the Buckners assert that Mr. Mayes's "malice" was evinced by his proposal that the Goodmans sell the Home to the Mayeses, they also assert that Mr. Mayes's "malice" was evinced by his comment to Mr. Goodman that he might need to demolish the Home in order to avoid a lawsuit. As the trial court found, however, the Buckners would still have been able to purchase the Home under the Goodman-Mayes Agreement for the cost of removal, a cost to which they had originally agreed in the Contract. The Buckners presented no evidence to indicate that the Mayeses were attempting to earn more than their original estimate for moving the Home, and the Mayeses certainly had nothing to gain from the Home's demolition. As the trial court found, when "Mr. Buckner began accusing them [the Mayeses] of stealing the house from him . . . that . . . was the final straw that quirked this deal." We conclude that the trial court did not err by dismissing the Buckners' claim for intentional interference with contractual relations.

VI. Admissibility of Expert Witness Testimony

The Buckners also contend that the trial court erred by finding that Mr. Thacker's valuation of the Home as it would have been following removal from the Property was too speculative to be admissible at trial. The Buckners sought to admit Mr. Thacker's testimony in support of the amount of damages they claimed for loss of the Home. Having determined that the evidence does not preponderate against the trial court's dismissal of the Buckners' claims, we further determine that any issue regarding the admissibility of Mr. Thacker's testimony is pretermitted as moot.

VII. Attorney's Fees on Appeal

The Goodmans and the Mayeses each respectively raise the issue of whether the Buckners' appeal is frivolous. They each request an award of attorney's fees and costs on appeal pursuant to Tennessee Code Annotated § 27-1-122 (2000), which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

This Court's decision regarding whether to award attorney's fees on appeal is a discretionary one. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003).

We determine that this appeal was not frivolous or taken solely for delay. *See id.* at 67 ("A frivolous appeal is one that is devoid of merit . . . or one that has no reasonable chance of succeeding."). Accordingly, the Goodmans' and the Mayeses' respective requests for attorney's fees on appeal are denied.

## VIII. Conclusion

For the reasons stated above, we affirm the trial court's judgment. We deny the Goodmans' and the Mayeses' respective requests for attorney's fees on appeal. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below. The costs on appeal are assessed against the appellants, Ken Buckner and Brenda Buckner.

_____
THOMAS R. FRIERSON, II, JUDGE

22